[Cite as *State v. Dayton*, 2018-Ohio-3003.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO.  14-17-03

      v.

LUCKIE J. DAYTON, III,              O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 2016-CR-0131

Judgment Affirmed

Date of Decision:   July 30, 2018

APPEARANCES:

    *Natalie J. Bahan* for Appellant

    *Melissa A. Chase* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Luckie J. Dayton III ("Dayton"), appeals the February 22, 2017 judgment entry of sentence of the Union County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} In April 2015, Dayton's children, M.R.D., M.A.D., M.D., and I.D., as well as Dayton's stepdaughter, P.W., were removed from Dayton's home following an allegation by P.W. that Jessica Dayton ("Jessica"), Dayton's wife, was physically abusing M.R.D. and M.A.D. At first, Dayton was permitted to visit with his children because only Jessica was charged with endangering children. However, following a visit with M.A.D. in August 2015, Dayton was arrested for intimidation after M.A.D. alleged that Dayton showed her a picture during the visit which stated something to the effect of "Your Mother Did Not Abuse You." On August 31, 2015, the Union County Grand Jury indicted Dayton on one count of intimidation in violation of R.C. 2921.03(A), a third-degree felony. (Case No. 2015-CR-162, Doc. No. 1). On September 17, 2015, Dayton appeared for arraignment and entered a plea of not guilty. (Case No. 2015-CR-162, Doc. No. 8).

{¶3} Although Dayton was not initially implicated in Jessica's abuse of M.R.D. and M.A.D., he was soon charged with offenses relating to the abuse. He was also charged with offenses stemming from an allegation that Dayton sexually abused P.W. and that he attempted to bribe M.R.D. and M.A.D. to give favorable

testimony in proceedings against Jessica.  On June 20, 2016, the Union County Grand Jury indicted Dayton on ten counts, including: Counts One and Two of gross sexual imposition in violation of R.C. 2907.05(A)(4), (C)(2), third-degree felonies; Counts Three and Four of endangering children in violation of R.C. 2919.22(B)(2), (E)(3), second-degree felonies; Counts Five and Six of endangering children in violation of R.C. 2919.22(A), (E)(2)(c), third-degree felonies; Counts Seven and Eight of permitting child abuse in violation of R.C. 2903.15(A), (C), third-degree felonies; and Counts Nine and Ten of bribery in violation of R.C. 2921.02(C), (G), third-degree felonies.  (Case No. 16-CR-0131, Doc. No. 1).  Although the indictment charged Dayton with violations of R.C. 2919.22(B)(2) as the principal offender as permitted under R.C. 2923.03(F), a subsequently filed bill of particulars clarified that the State was pursing the charges against Dayton under the complicity statute for involvement with Jessica's abuse of two of his minor daughters, M.R.D. and M.A.D., in violation of R.C. 2919.22(B)(2).  (Case No. 16-CR-0131, Doc. No. 14A).

{¶4} On July 22, 2016, Dayton appeared for arraignment and entered pleas of not guilty to the ten-count indictment.  (Case No. 16-CR-0131, Doc. No. 8).

{¶5} On December 1, 2016, the State filed a motion to consolidate case numbers 2015-CR-162 and 2016-CR-0131.  (Case No. 16-CR-0131, Doc. No. 42); (Case No. 2015-CR-162, Doc. No. 35).  On December 2, 2016, the trial court

granted the State's motion and consolidated the cases under case number 2016-CR-0131. (Case No. 16-CR-0131, Doc. No. 45); (Case No. 2015-CR-162, Doc. No. 36). The intimidation charge that was the subject of case number 2015-CR-162 was later designated as Count Eleven in case number 16-CR-0131. (*See* Case No. 16-CR-0131, Doc. Nos. 64, 74).

{¶6} On December 9, 2016, the State filed a motion requesting that the trial court call Jessica as the court's witness under Evid.R. 614(A). (Case No. 16-CR-0131, Doc. No. 56). On December 12, 2016, the trial court granted the State's motion to call Jessica Dayton as the court's witness. (Case No. 16-CR-0131, Doc. No. 61).

{¶7} A jury trial was held on December 12-16, 2016. (Dec. 12-16, 2016 Tr., Vol. I, at 2-6). At the conclusion of the State's case-in-chief on December 15, 2016, Dayton moved for a Crim.R. 29 judgment of acquittal for Counts One through Eleven of the indictment. (Dec. 12-16, 2016 Tr., Vol. VII, at 1302-1307). The trial court granted Dayton's motion as to Count One and denied his motion as to Counts Two through Eleven. (*Id.* at 1307-1308, 1315); (Case No. 16-CR-0131, Doc. No. 64). The jury found Dayton guilty as to Counts Two through Eleven. (Dec. 12-16, 2016 Tr., Vol. VIII, at 1731-1738); (Case No. 16-CR-0131, Doc. Nos. 65, 66, 67, 68, 69, 70, 71, 72, 73, 74).

{¶8} The trial court held a sentencing and sex-offender registration hearing on February 22, 2017. (Feb. 22, 2017 Tr.); (Case No. 16-CR-0131, Doc. Nos. 81, 82). The trial court determined that Counts Three, Five, and Seven are allied offenses of similar import and merged those counts. (Case No. 16-CR-0131, Doc. No. 81). The trial court also determined that Counts Four, Six, and Eight are allied offenses of similar import and merged those counts. (Case No. 16-CR-0131, Doc. No. 81). The State elected to pursue Counts Three and Four for sentencing. (Case No. 16-CR-0131, Doc. No. 81). The trial court sentenced Dayton to 54 months in prison on Count Two, 4 years in prison on Count Three, and 4 years in prison on Count Four, to be served consecutively for an aggregate prison term of 12 years and 6 months. (Case No. 16-CR-0131, Doc. No. 81). Dayton was also sentenced to 30 months in prison on Count Nine, 30 months in prison on Count Ten, and 30 months in prison on Count Eleven, each of which is to be served concurrently with his sentences for Counts Two, Three, and Four. (Case No. 16-CR-0131, Doc. No. 81). The trial court also classified Dayton as a Tier II sex offender. (Case No. 16-CR-0131, Doc. No. 81).

{¶9} Dayton filed his notice of appeal on March 24, 2017. (Case No. 16-CR-0131, Doc. No. 89). He raises three assignments of error for our review. We will address Dayton's assignments of error in the order presented, and for the sake of clarity, we will address Dayton's second and third assignments of error together.

Case No. 14-17-03

## Assignment of Error No. I

**Defendant-appellant's convictions are supported by insufficient evidence, and are against the weight of the evidence and therefore resulting [sic] in a denial of due process.**

{¶10} In his first assignment of error, Dayton argues that his convictions are based on insufficient evidence and against the manifest weight of the evidence. As to his endangering-children, complicity-to-endangering-children, and permitting-child-abuse convictions, Dayton argues that the State presented insufficient evidence that he either had knowledge of the abuse occurring in his residence or that he recklessly disregarded a substantial risk that abuse was taking place; he also argues that the evidence weighs against the jury's finding to the contrary. As to his gross-sexual-imposition conviction, Dayton argues that the jury erred in crediting the victim's account of the alleged abuse and that, as a result, his gross-sexual-imposition conviction is against the manifest weight of the evidence.[1]

{¶11} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Accordingly, we address each legal concept individually.[2]

---

[1] Dayton does not challenge his bribery or intimidation convictions. As such, we will not address the sufficiency or weight of the evidence supporting these convictions. *See* App.R. 12(A)(2); App.R. 16(A). *See also State v. Stevens*, 3d Dist. Allen No. 1-14-58, 2016-Ohio-446, ¶ 7, fn. 1.

[2] We note that Dayton combined two separate arguments into his first assignment of error. Loc.R. 11(A) states that "[e]ach assignment of error must be separately argued in the briefs unless the same argument, and no other, pertains to more than one assignment of error." While Dayton's combined argument is against our local rules, in the interest of justice, we elect to address Dayton's arguments. *See State v. Saltz*, 3d Dist. Hancock No. 5-14-33, 2015-Ohio-3097, ¶ 31, 37.

{**¶12**} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

{**¶13**} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier

of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶14} Dayton was convicted of two counts of endangering children in violation of R.C. 2919.22(A), two counts of complicity to endangering children in violation of R.C. 2923.03(A) and R.C. 2919.22(B)(2), two counts of permitting child abuse in violation of R.C. 2903.15(A), and one count of gross sexual imposition in violation of R.C. 2907.05(A)(4).

{¶15} The criminal offense of endangering children is codified in R.C. 2919.22, which provides, in relevant part:

(A) No person, who is the parent * * * of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

(B)   No person shall do any of the following to a child under eighteen years of age * * *:

* * *

(2)   Torture or cruelly abuse the child

R.C. 2919.22(A), (B)(2).

{¶16} "'To find the defendant guilty of child endangering under [R.C. 2919.22(A)], the state must prove beyond a reasonable doubt that the defendant:  (1) was the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen; (2) violated a duty to said child; (3) created a substantial risk to the health or safety of the child; and (4) acted recklessly.'" *State v. Miller*, 3d Dist. Seneca No. 13-13-14, 2014-Ohio-261, ¶ 11, quoting *State v. Miller*, 3d Dist. Logan Nos. 8-07-07 and 8-07-08, 2007-Ohio-6711, ¶ 12, citing R.C. 2919.22(A) and *State v. McGee*, 79 Ohio St.3d 193, 195 (1997).  A "substantial risk" means "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).  The culpable mental state required to sustain a conviction for endangering children under R.C. 2919.22(A) is recklessness.  *McGee* at 195.  "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

"A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." *Id.*

{¶17} On the other hand, to prove the offense of endangering children under R.C. 2919.22(B)(2), the State must prove beyond a reasonable doubt that a defendant recklessly tortured or cruelly abused a child under eighteen years of age. *See State v. Journey*, 4th Dist. Scioto No. 09CA3270, 2010-Ohio-2555, ¶ 24, citing R.C. 2919.22(B)(2). R.C. 2919.22 does not define the terms "torture" or "cruelly abuse." *See State v. Wainscott*, 12th Dist. Butler No. CA2015-07-056, 2016-Ohio-1153, ¶ 24, quoting *State v. Nivert*, 9th Dist. Summit No. C.A. NOS. 16806, 1995 WL 608415, *2 (Oct. 18, 1995). "However, the word 'torture' as used in [R.C. 2919.22(B)(2)] has been defined as 'the infliction of severe pain or suffering (of body or mind),' with the word 'abuse' being defined as 'ill-use, maltreat; to injure, wrong or hurt.'" *Id.*, quoting *State v. Surles*, 9th Dist. Summit No. 23345, 2007-Ohio-6050, ¶ 5. "Moreover, to treat someone 'cruelly' means to 'demonstrate indifference to or delight in another's suffering,' as well as to treat that person 'severely, rigorously, or sharply.'" *Id.*, quoting *State v. Brown*, 9th Dist. Summit No. 23737, 2008-Ohio-2956, ¶ 12. As with R.C. 2919.22(A), the culpable mental state required to sustain a conviction for endangering children under 2919.22(B)(2) is recklessness. *See id.* at ¶ 25, citing *State v. Ossege*, 12th Dist. Clermont Nos.

CA2013-11-086 and CA2013-11-087, 2014-Ohio-3186, ¶ 55 and *State v. Adams*, 62 Ohio St.2d 151 (1980), paragraph one of the syllabus.

{¶18} R.C. 2923.03, Ohio's complicity statute, provides, in relevant part, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense * * *." R.C. 2923.03(A)(2).

> To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "'"Evidence of aiding and abetting may be shown by either direct or circumstantial evidence, and participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed."'" *State v. Wright*, 3d Dist. Hardin No. 6-15-14, 2016-Ohio-5465, ¶ 9, quoting *State v. Rowe*, 3d Dist. Seneca No. 13-10-14, 2011-Ohio-5739, ¶ 32, quoting *State v. Gragg*, 173 Ohio App.3d 270, 2007-Ohio-4731, ¶ 21 (12th Dist.). Accordingly, to sustain a conviction for complicity to endangering children under R.C. 2923.03(A)(2) and 2919.22(B)(2), the State must

prove beyond a reasonable doubt that a defendant recklessly aided or abetted another's violation of R.C. 2919.22(B)(2). *See State v. Diggs*, 10th Dist. Franklin No. 14AP-18, 2014-Ohio-3340, ¶ 25-26 (applying the recklessness culpability standard to the complicity statute).

**{¶19}** The criminal offense of permitting child abuse is codified in R.C. 2903.15, which provides, in relevant part, that "[n]o parent, guardian, custodian, or person having custody of a child under eighteen years of age * * * shall cause serious physical harm to the child, or the death of the child, as a proximate result of permitting the child to be abused [or] to be tortured * * *." R.C. 2903.15(A). The culpable mental state required to sustain a conviction under R.C. 2903.15(A) is recklessness. *See State v. Ferguson*, 2d Dist. Clark No. 08CA0050, 2011-Ohio-4285, ¶ 27. "Serious physical harm" means:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; [or]

-12-

(e)   Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5)(a)-(e).

**{¶20}** The criminal offense of gross sexual imposition is codified in R.C. 2907.05 which provides, in relevant part, that "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."  R.C. 2907.05(A)(4).  "Sexual contact" is defined in R.C. 2907.01(B) as meaning "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."  "Whether touching is done for the purpose of sexual gratification is a 'question of fact to be inferred from the type, nature, and circumstances surrounding the contact.'"  *State v. Todd*, 3d Dist. Hardin No. 6-16-11, 2017-Ohio-4355, ¶ 12, quoting *In re K.C.*, 1st Dist. Hamilton No. C-140307, 2015-Ohio-1613, ¶ 32.

**{¶21}** At trial, the State first offered the testimony of Detective Nathan Stone ("Detective Stone") of the Marysville Division of Police.  (Dec. 12-16, 2016 Tr., Vol. I, at 243-244).  Detective Stone testified that he was present on the day that a

search warrant was executed at Dayton's residence and that he was tasked with taking photographs of the residence and items seized. (*Id.*). Detective Stone identified State's Exhibits 1 through 11 as photographs depicting the residence as it appeared on May 27, 2015 as well as items seized from the residence. (*Id.* at 245-260) (*See* State's Exs. 1-11).

**{¶22}** Next, Dayton's then 14-year-old daughter, M.R.D., testified that when she was living with Dayton, she recalled having fights with her sister, M.A.D., "almost every day" because "[Jessica] would force [M.R.D. and M.A.D.] to fight over stupid stuff" like "not letting the dog out" and "keeping [their] brother and sister from waking up [Jessica]." (Dec. 12-16, 2016 Tr., Vol. IV, at 748, 750, 759). According to M.R.D., Jessica would tell M.R.D. and M.A.D. to "go into the bathroom and sort it out * * * and by sort it out, she meant, * * * hit and punch and stuff * * *." (*Id.* at 750). She testified that she suffered "marks" from the fights and "busted lips." (*Id.* at 750-751). M.R.D. testified that she was often forced to fight with M.A.D. during car trips. (*Id.* at 766-767). On one occasion, she was forced to hit M.A.D. in the head with a lunchbox. (*Id.* at 767). M.R.D. stated that she has a "few scars on [her] forehead" from fighting with M.A.D. but that her facial scars were "mainly from [Jessica]." (*Id.* at 751). M.R.D. testified that Jessica once hit her in the head with the "clip of a belt," leaving a visible scar. (*Id.*). She testified that the belt buckle "busted open" her head and that Jessica used super glue to close

the wound without taking her to the doctor. (*Id.* at 751-752). She testified that her head was repeatedly slammed into the walls of their residence by Jessica, that the walls were damaged as a result, and that a hole in the wall, caused when Jessica pushed M.A.D. into the wall, had to be covered over with a poster. (*Id.* at 754). She testified that Dayton was at home the day Jessica pushed M.A.D. into the wall, causing the hole. (*Id.* at 779).

{¶23} M.R.D. also testified that Jessica forced her and M.A.D. to "tuck in" their toes because Jessica said their "feet were disgusting." (*Id.* at 756). She testified that they were forced to walk with their toes tucked under their feet "all day." (*Id.*). She testified that, on one occasion, Jessica "took a hammer to [their] feet." (*Id.*). M.R.D. testified that Jessica once pushed M.A.D., causing M.A.D. to hit her head on the corner of a night stand. (*Id.* at 757). As a result, M.A.D. got a "goose egg" on her head, which Jessica told M.R.D. to get rid of by pushing on it. (*Id.*). M.R.D. testified that she complied with Jessica's instruction and that M.A.D. then had "two black eyes and her whole forehead was swollen" for approximately two days. (*Id.* at 757-758). She also testified that Jessica forced them to "float"— stand on their "tippy toes" and fall face forward without catching themselves with their hands—"[a]lmost every day after [they] got home from school." (*Id.* at 762). She testified that one time, Jessica stood on M.A.D.'s stomach until M.A.D. lost consciousness and stopped breathing, resulting in M.R.D. having to perform CPR

on M.A.D. (*Id.* at 763-764). M.R.D. testified that Jessica would "quite often" conceal her and M.A.D.'s injuries with makeup and that they would have cuts and bruises "most of the time." (*Id.* at 758-759). She testified that this pattern continued for at least four years from the time that she was 8-years-old until she was placed in foster care just before she turned 13-years-old. (*Id.* at 770).

{¶24} As to Dayton's knowledge of what was happening, M.R.D. testified that Jessica recorded M.A.D. and M.R.D. fighting so that she could show Dayton to "prove to him that we were fighting with each other, and this would always happen when he was gone." (*Id.* at 755). She testified that she would interact with Dayton when he would help with homework after school and that they would also eat together. (*Id.* at 764-765). As to other people's knowledge of what was happening at home, M.R.D. stated that she would tell teachers only that she and M.A.D. were fighting because Jessica instructed her to say no more than that. (*Id.* at 759-760). She testified that she never told them the full extent of what was happening because she was scared to do so. (*Id.* at 772).

{¶25} On cross-examination, M.R.D. testified that Dayton was "usually at work" and not present when Jessica made M.R.D. and M.A.D. fight each other. (*Id.* at 784). She testified that they "were forced to tell [Dayton] that we were fighting with each other" without being instructed to do so by Jessica "so that's what he thought." (*Id.* at 789). She stated that Jessica would threaten them so that they

would not tell Dayton what was really going on and why she was fighting M.A.D. (*Id.* at 784-785). M.R.D. identified State's Exhibit 27 as a series of photographs depicting bruises and other injuries. After reviewing State's Exhibit 27, she stated that Dayton was not present when those injuries were inflicted and that he was never informed exactly how M.R.D. sustained those injuries. (*Id.* at 789). She testified that Dayton never hit them and Jessica never hit her or M.A.D. in the presence of Dayton. (*Id.* at 790).

{¶26} In addition, M.R.D. testified that Dayton was upstairs trying to sleep when Jessica pushed M.A.D. into the wall causing the hole which was later covered up by a poster. (*Id.* at 793-794). She testified that when Dayton inquired as to how the wall was damaged, he was told that M.A.D. was being clumsy and fell into the wall. (*Id.* at 795). M.R.D. then testified as to another hole in the bathroom wall caused by Jessica repeatedly pushing M.R.D. and M.A.D. into it. (*Id.* at 796). She testified that Jessica told Dayton that that hole was caused by M.A.D. and M.R.D.'s fighting. (*Id.* at 797). Finally, M.R.D. opined that she did not think that Dayton knew of Jessica's abuse. (*Id.* at 801-802).

{¶27} The State also offered the testimony of M.A.D., who was 15-years-old at the time of her testimony. (Dec. 12-16, 2016 Tr., Vol. V, at 842). M.A.D.'s testimony was, in large part, identical to M.R.D.'s testimony. When asked what her and her siblings did after school, M.A.D. replied that "usually [M.R.D.] and I fought

and stuff." (*Id.* at 844). M.A.D. testified that she and M.R.D. would fight and hit each other "[a]nywhere [they] were told" by Jessica. (*Id.* at 845-846). She said that, as a result, she suffered bloody lips and black eyes. (*Id.* at 846, 860). M.A.D. also confirmed many of the details of M.R.D.'s account of the "goose egg" M.A.D. sustained. (*Id.* at 846-847). She testified that she missed two days of school as a result of that incident, and when she returned to school, makeup was applied to conceal her injuries. (*Id.* at 848).

{¶28} M.A.D. identified State's Exhibit 36 as a picture depicting a scar on the back of her head. (*Id.* at 863-864). When asked how she got the scar, M.A.D. responded that it could have happened when Jessica "stomped [her] head into the floor[,] * * * slammed [her] head into the corner of walls[,] * * * [or] hit [her] in the head with belts." (*Id.* at 865).

{¶29} M.A.D.'s testimony complemented much of M.R.D.'s account of day-to-day life in the Dayton household. (*See id.* at 850-853, 867-868). Like M.R.D., M.A.D. testified that Dayton was upstairs sleeping when she was shoved against the wall, creating the hole that was later covered with a poster. (*Id.* at 854-855, 898-899). She further testified that Jessica struck her and M.R.D. with belts and that M.R.D. sustained a scar on her forehead from getting him the head with a belt buckle by Jessica. (*Id.* at 866-867). She stated that Jessica instructed M.A.D. and M.R.D. to fight during car trips. (*Id.* at 872-875). When asked how often she had bloody

lips and noses, M.A.D. responded that she had them "[a]ll the time." (*Id.* at 869). According to M.A.D., she was in pain "[a]lmost every day. * * * [I]t was every day after I got home from school if [Dayton] wasn't there." (*Id.* at 851).

{¶30} M.A.D. also testified as to other people's knowledge of, and suspicion about, what was actually going on at home with Jessica. She testified that teachers occasionally asked about her injuries and that she told them that she "fought with [her] sister." (*Id.* at 860). M.A.D. testified that "I told what I was told to tell them." (*Id.*). She stated that she did not actually tell teachers what was going on because she was scared that no one would believe her. (*Id.*). Moreover, she testified that caseworkers from the Union County Department of Job and Family Services ("JFS") investigated reports of abuse at the Dayton residence and that she would lie to the caseworkers about how she actually sustained the injuries. (*Id.* at 885). M.A.D. testified that Dayton would be upset when JFS would visit "because he thought it was because of [M.R.D.] and [M.A.D.] fighting. * * * He just told us that we need to stop." (*Id.* at 886). When asked whether Dayton ever saw them fighting, M.A.D. responded that he did and that "[h]e'd tell us to knock it off, and then he'd ground us or something like that." (*Id.*). She testified that when Dayton told them to stop fighting, they would. (*Id.*). M.A.D. could not remember whether they would fight to the point of being bloodied or seriously injured when Dayton was present. (*Id.*). Finally, she testified that Dayton was not home when Jessica hit her or M.R.D.

but that he was "upstairs sleeping" when the "big hole" was made in the wall. (*Id.* at 898-899).

{¶31} On cross-examination, M.A.D. testified that Dayton was usually at work or refereeing soccer games when Jessica told her to fight with M.R.D. (*Id.* at 901). Further, M.A.D. stated that she was instructed to lie to Dayton and tell him that her injuries were sustained simply through fighting with M.R.D. without disclosing Jessica's involvement. (*Id.* at 902). She testified that when Dayton found out about the fighting, "[h]e got pretty upset and * * * said if this is going to keep happening * * * we'd get in trouble, and [Dayton and Jessica] could get in trouble [and] [g]o to jail." (*Id.* at 908). M.A.D. stated that when her bruises and injuries were bad enough, Jessica would conceal them with makeup before they went to school but that she would not use makeup to conceal the injuries from Dayton because the injuries were "usually blamed on [M.R.D.]" (*Id.* at 908). M.A.D. testified that she did not believe that Dayton knew the truth about what was happening. (*Id.* at 902).

{¶32} On re-direct examination, M.A.D. testified that Dayton was worried about M.A.D. and M.R.D. fighting because it could lend to the appearance of abuse. (*Id.* at 917). She also said that Dayton was aware of the large hole covered up by the poster. (*Id.*).

{¶33} In addition to M.R.D.'s and M.A.D.'s testimony, the State offered the testimony of M.D., then nine-years old, and I.D., then seven-years old, M.R.D. and M.A.D.'s half-siblings. (*See* Dec. 12-16, 2016 Tr., Vol. IV, at 680, 718).

{¶34} I.D. testified that he witnessed M.R.D. and M.A.D. fighting but that he also observed Jessica "hurt" M.R.D. and M.A.D. (*Id.* at 685). He testified that M.R.D. and M.A.D. suffered bloody noses but he stated that he never saw bruises on his sisters' faces. (*Id.* at 686). I.D. stated that Jessica was "[s]ometimes" there when M.R.D. and M.A.D. fought but that Dayton was not present. (*Id.*). He also testified that he remembered seeing holes in the walls caused by M.R.D. and M.A.D.'s fights and that one was covered over by a poster. (*Id.* at 687-688). I.D. testified that Dayton never witnessed M.R.D. and M.A.D. fight. (*Id.* at 690).

{¶35} On cross-examination, I.D. testified that, before being placed in foster care, Dayton was frequently absent from the home working at a Honda factory and refereeing soccer games. (*Id.* at 696).

{¶36} Next, M.D. testified that she sometimes saw M.R.D. and M.A.D. fight. (*Id.* at 721). M.D. also stated that she remembered seeing Jessica hit M.R.D. and M.A.D. and that the "big hole" in the wall happened when "[Jessica] shoved [M.A.D.'s] head into the wall." (*Id.* at 727, 731). She testified that M.R.D. and M.A.D. walked around "[m]ost of the time" with their "toes curled under" because when "they would just walk normal," Jessica would "yell at them." (*Id.* at 728).

**{¶37}** In addition, M.D. testified as to the types of injuries M.R.D. and M.A.D. sustained while living in the Dayton household. She testified that, on one occasion, M.A.D. "fell, and * * * got a bump on her head, and my other sister * * * kept pushing on it, and then the next morning [M.A.D.] had a black eye." (*Id.* at 722). According to M.D., M.A.D.'s eye was "completely shut, and it was blue and purple" and remained that way for a "couple of days." (*Id.*). M.D. also testified that M.R.D. and M.A.D. would "sometimes * * * get bloody noses and bloody lips." (*Id.* at 723).

**{¶38}** When asked whether Dayton was present when M.R.D. and M.A.D. fought each other, M.D. testified that her "dad wasn't home" and that M.R.D. and M.A.D. never fought when Dayton was home. (*Id.* at 721). She testified that she once tried to take a picture of M.R.D. and M.A.D. fighting so she could show Dayton but her device "went dead" and she "kept forgetting" to tell Dayton about the fighting. (*Id.* at 732).

**{¶39}** On cross-examination, M.D. was questioned about Dayton's work schedule and about how frequently Dayton was in the family home. M.D. testified that Dayton would "go to work really early in the morning" at Honda and that he would "come home after school." (*Id.* at 734). M.D. testified that Dayton had a second job refereeing soccer games. (*Id.*). She also confirmed that Dayton was not present when M.R.D. and M.A.D. were fighting and that he was at work. (*Id.*).

M.D. stated that she never saw Dayton hit M.R.D. or M.A.D. but that he would sometimes yell at them for things such as stealing Jessica's jewelry and wearing it to school. (*Id.* at 735). M.D. stressed that she had not been instructed by Jessica or anyone else to lie about witnessing the fights between M.R.D. and M.A.D. (*Id.* at 734-735).

{¶40} The State also offered the testimony of P.W., Dayton's then 12-year-old stepdaughter. (Dec. 12-16, 2016 Tr., Vol. VI, at 1078). P.W.'s testimony offered further support for M.R.D.'s, M.A.D.'s, I.D.'s, and M.D.'s accounts of the abuse perpetrated by Jessica. She testified that when she was still living at the residence with Dayton, Jessica, and her siblings, Jessica "was making [M.A.D. and M.R.D.] fight each other, and she would abuse them in many other ways." (*Id.* at 1082). After a video of one of M.R.D. and M.A.D.'s fights was played for the jury, P.W. remarked that the fight depicted in the video was "one of the nicer fights that they would have" and that the fights were usually "bloody." (*Id.* at 1090).

{¶41} P.W. testified that Jessica once forced M.R.D. and M.A.D. to eat SPAM, which Jessica videotaped. (*Id.* at 1083-1084). P.W. also confirmed that M.R.D. and M.A.D. had to "curl [their] toes" when they walked around the family's house "every day, every second they were walking" and that if they failed to walk like this, "[t]hey would either get their feet hit with a hammer or [Jessica] would stomp on their feet." (*Id.* at 1087). Moreover, P.W. testified that "[t]here were a lot

of times" that Jessica would hit them with belts and that, on one occasion, Jessica struck M.R.D. with a belt buckle causing "a huge gash in her forehead." (*Id.* at 1095, 1097).

**{¶42}** As concerning M.R.D.'s and M.A.D.'s injuries, P.W. testified that "[t]here was never a time that" M.R.D. and M.A.D. did not have injuries or bruises. (*Id.* at 1092). She testified that the abuse of M.R.D. and M.A.D. continued for "[m]ore than at least three years" and that the girls had injuries every day during that period. (*Id.* at 1111). P.W. testified that once, when P.W. returned home after spending time at her biological father's house, "[M.A.D.] looked like she was a completely different person because her head was beaten so bad. * * * [S]he had * * * a greenish brownish bruise that was a bump that had started just as a goose egg, and her face was really widened at the sides. Really swollen." (*Id.* at 1085, 1094). P.W. testified that Jessica attempted to conceal M.A.D.'s extensive bruising and swelling by giving her sunglasses to wear and putting her "hair * * * into her face so much that you couldn't tell at all." (*Id.* at 1085). P.W. also described Jessica's attempts to conceal the girls' injuries with makeup. (*Id.* at 1093).

**{¶43}** Portions of P.W.'s testimony focused on the extent to which Dayton was aware of what was happening with M.R.D., M.A.D., and Jessica. When asked whether Dayton saw the injuries on M.R.D. and M.A.D., P.W. responded that he did but she stressed that she did not think that Dayton often witnessed M.R.D. and

M.A.D. fighting when he was home because he was "upstairs." (*Id.* at 1091-1092). However, she testified that Dayton once "saw [Jessica] bash [M.A.D.'s] head into the wall." (*Id.* at 1092). P.W. testified that after he saw this, Dayton yelled at Jessica and "told her not to do that." (*Id.*). In addition, she testified that M.R.D. and M.A.D. were once forced to "hit each other in the private parts with [a] water bottle" while riding in the backseat of the family vehicle. (*Id.* at 1096). She testified that, afterward, they were "very swollen" and that "they were forced to show [Dayton]." (*Id.* at 1096-1097).

{¶44} P.W. also testified about alleged sexual abuse perpetrated by Dayton against her. She described three "uncomfortable" incidents with Dayton. (*Id.* at 1100-1102). In particular, P.W. testified that once "[w]hen [Jessica] went to get Honeybell Oranges early in the morning, [Dayton] got into [P.W.'s] bed and unzipped [her] footy pajamas and licked [her] chest." (*Id.* at 1102). P.W. testified that, during this incident, she "kept pretending to fake sleep because [she] didn't know what to do." (*Id.*). While P.W. was uncertain as to her exact age when this incident occurred, she estimated that she was less than ten years old at the time. (*Id.* at 1109). She testified that she did not tell anyone about the incident until she visited her grandmother, at which point she told her grandmother what had happened. (*Id.* at 1102). P.W. testified that, after this incident, Jessica took her to Nationwide Children's Hospital ("Nationwide") for a forensic interview. (*Id.* at 1103). She

testified that she did not disclose the incident in the interview at Nationwide because "[Jessica] talked to [her] with [Dayton] in the room" and told her that disclosing Dayton's conduct would "ruin the family's reputation, and it would make all [her] other siblings unhappy." (*Id.* at 1103-1104).

**{¶45}** On cross-examination, P.W. testified that she eventually told her teachers about what was happening at home because the fighting between M.R.D. and M.A.D. and Jessica's abuse "started to not just be punching or hitting. It was also kicking, stomping, hammers, belts, just everything she could think of." (*Id.* at 1114-1115). Further, P.W. reaffirmed her testimony that Dayton licked her chest and again acknowledged that she did not disclose the alleged abuse during the interview at Nationwide. (*Id.* at 1120, 1123).

**{¶46}** On re-direct examination, P.W. further elaborated on the circumstances surrounding Dayton's alleged sexual abuse. She testified that no one else was in the room when Dayton licked her chest because Jessica was out buying oranges with M.R.D. and M.A.D. and M.D. and I.D. were in I.D.'s room. (*Id.* at 1127-1128). Finally, she identified the part of her body Dayton licked as her "B-O-O-B." (*Id.* at 1128-1129).

**{¶47}** Jessica was called as the court's witness. (Dec. 12-16, 2016 Tr., Vol. II, at 272, 275). On examination by the State, Jessica testified that she was convicted of four counts of endangering children based on her abuse of M.R.D. and M.A.D.

(*Id.* at 276, 279, 286). Jessica testified that M.R.D. and M.A.D. had bruises "[a] few times a week maybe" and that the bruises were "sometimes" visible. (*Id.* at 287). She testified that she sometimes caused the bruises to the girls' bodies but that at other times, they received their injuries from fighting each other. (*Id.* at 289-290). Jessica resisted the characterization of her involvement in M.R.D. and M.A.D.'s fights as "forcing" them to fight but she conceded that she "encouraged" them to do so. (*Id.* at 290-291). Jessica testified that M.R.D. and M.A.D. were injured multiple times per week and sometimes multiple times per day while in her care. (*Id.* at 292). When asked whether she thought M.R.D. and M.A.D. were safe in her care, Jessica responded that "[f]or the most part," they were not. (*Id.* at 345).

{¶48} Jessica admitted to making the girls "float." (*Id.* at 301). Further, Jessica testified that M.A.D. once had a bump on her head which M.R.D. pushed on but denied that she instructed M.R.D. to push on the bump. (*Id.* at 305). She stated that, the next day, both of M.A.D.'s eyes were blackened and that M.A.D. was kept home from school for two or three days. (*Id.* at 306). When asked whether Dayton saw M.A.D.'s black eyes, Jessica responded: "I suppose he did. I don't know how he wouldn't have. We all lived together." (*Id.* at 306). Jessica acknowledged that the holes in the walls of their residence were caused by the bodies or heads of the girls. (*Id.* at 322). She admitted to applying makeup to conceal the girls' bruises and that she did so before the girls went to school. (*Id.*). When asked whether

M.R.D. would "go to school with black eyes that were caused by [Jessica]," she responded: "On one or two occasions, yes." (*Id.* at 323). She also testified that M.R.D. went to school with black eyes that were caused by M.A.D. after Jessica instructed her to hit M.R.D. (*Id.*). Jessica admitted to using glue to "fix" an injury on M.R.D.'s head. (*Id.*). She testified that neither she nor Dayton sought medical treatment for the girls' injuries. (*Id.* at 314). She testified that she asked M.R.D. and M.A.D. to keep the fact that she was instructing them to fight a secret. (*Id.* at 343).

{¶49} While Jessica's testimony was consistent with many elements of the children's testimony, it differed in key respects. She denied striking M.R.D. in the head with a belt buckle. (*Id.* at 292). She also denied that M.R.D. and M.A.D. were force-fed SPAM, that she ever threw M.R.D. or M.A.D. into walls or furniture, or that she ever sat or stood on M.A.D. until M.A.D. lost consciousness. (*Id.* at 287, 304-305, 315). Although Jessica contended that making the girls "walk around with their toes curled under" began as a joke, she admitted that "had happened a few times." (*Id.* at 296). However, she denied that they had to walk like that at all times. (*Id.* at 297). Further, she denied that they would be punished if they did not walk this way and that she would make them stomp on each other's feet. (*Id.* at 296).

{¶50} She testified that M.R.D. and M.A.D. were sent to Nevada to visit family during a 2010 investigation by JFS and that the decision to do so was made

jointly between herself and Dayton. (*Id.* at 316-317, 319). She could not recall M.A.D. or M.R.D. being interviewed by law enforcement during that investigation. (*Id.* at 320).

{¶51} Jessica testified that she recorded instances of M.R.D. and M.A.D. fighting and that in these recordings, she never attempted to stop them from fighting. (*See id.* at 296-297, 303-304). When asked who saw the videos, Jessica stated that "[Dayton] had seen maybe a few seconds of two of them, two or three of them" on one occasion. (*Id.* at 304). She testified that she sometimes spoke to M.R.D. and M.A.D. in a harsh, strident tone and that she was using an angry, abusive tone of voice with M.R.D. and M.A.D. in the videos she showed to Dayton. (Dec. 12-16, 2016 Tr., Vol. III, at 381, 383). When asked why she showed Dayton videos of the girls fighting, Jessica said she did so "that [Dayton] would see that there was so much chaos in the house when he was gone." (Dec. 12-16, 2016 Tr., Vol. II, at 331-332). As to Dayton's knowledge of the abuse perpetrated by Jessica and M.R.D. and M.A.D.'s fighting, Jessica testified that M.R.D. and M.A.D. "[v]ery rarely" fought when Dayton was at home and that Dayton would stop the fights when he was present. (*Id.* at 329). Jessica described that although he was often absent, Dayton still interacted with the children "two or three nights a week." (*Id.* at 341).

{¶52} Finally, Jessica testified as to her knowledge concerning the sexual abuse allegations made against Dayton. Jessica testified that she reported the

alleged sexual abuse of P.W. and that she took P.W. to Nationwide. (*Id.* at 335). However, she testified that she does not believe P.W.'s allegations and that although she initially supported P.W. in disclosing the alleged abuse, she subsequently did not. (*Id.* at 348).

{¶53} On examination by Dayton's trial counsel, Jessica reiterated her beliefs about P.W.'s allegations of sexual abuse. She testified that although she believed P.W.'s accusations at first, she had since come to doubt P.W.'s story because P.W. "began to change her story quite a bit." (Dec. 12-16, 2016 Tr., Vol. III, at 394-395). She also testified that it was her understanding that P.W. retracted her allegation. (*Id.* at 397).

{¶54} Jessica testified that she did "[e]verything [she] could" to conceal the girls' fighting and injuries from Dayton, including applying makeup and using different hairstyles and clothes. (*Id.* at 403). She stated that she would conceal the injuries "[p]robably a few times a week." (*Id.* at 404). She insisted that Dayton did not know about the extent of the abuse or that she was instructing M.A.D. and M.R.D. to fight. (*Id.* at 407). When asked where Dayton was during the times that she instructed M.R.D. and M.A.D. to fight, Jessica responded that he was "[g]one at work mostly." (*Id.* at 410). She testified that they never fought at her instruction while Dayton was home. (*Id.*).

{¶55} On re-examination by the State, Jessica testified that the fights between M.A.D. and M.R.D. depicted in the video recordings were "probably close to some of the worst things" that they did to each other. (*Id.* at 421). She also testified that she did not make any videos depicting herself actually striking or otherwise injuring the girls. (*Id.*). She confirmed that M.R.D. and M.A.D. would fight each other when Dayton was home but not at her instruction. (*Id.* at 422). She testified that she never told Dayton, or anyone else for that matter, that she was abusing M.R.D. and M.A.D. (*Id.* at 423-424).

{¶56} The State offered the testimony of Jonathan Robbins ("Robbins"), a computer forensics specialist with the Cybercrimes Unit of the Ohio Bureau of Criminal Investigation ("BCI"). (Dec. 12-16, 2016 Tr., Vol. III, at 439). He testified that he extracted data from the SD card of Jessica's phone, from the phone itself, and from a digital camera. (*Id.* at 445-446). He identified State's Exhibit 22 as a disc containing video files he extracted from the SD card used in Jessica's phone and from the digital camera. (*Id.* at 449, 457-461). Some of these video files depict M.R.D. and M.A.D. fighting each other while others depict M.R.D. and M.A.D. eating SPAM while Jessica yells at them. These videos were played for the jury at different times throughout the course of the trial.

{¶57} The State also offered the testimony of Myra Lauharn ("Lauharn"), Dayton's grandmother. (Dec. 12-16, 2016 Tr., Vol. III, at 427-428). Lauharn

testified that she "knew something was going on" because she saw "[b]lack eyes on the girls," especially M.A.D. (*Id.* at 429). Lauharn testified that she observed the injuries on the few occasions when the girls would visit. (*Id.*). She estimated that she saw the girls with black eyes "three or four" times when she was visiting with the family and that Dayton was present during these visits unless he had to work. (*Id.* at 435-436). She testified that when she asked M.A.D. about the injury, M.A.D. "just smiled" and said "[M.R.D.] and [she] were fighting." (*Id.* at 431). Lauharn remembered seeing that the bruises and black eyes were concealed with makeup. (*Id.*). She also testified that Jessica showed her video footage of the girls fighting. (*Id.* at 429-430). She testified that she suspected that Jessica was abusing the children but never told Dayton about her suspicions because Jessica was always "right there" with Dayton. (*Id.* at 433).

{¶58} Next, Barbara Hoffman ("Hoffman"), a former neighbor of the Dayton family, testified that, when the Daytons were her neighbors, she observed injuries on the children. (Dec. 12-16, 2016 Tr., Vol. III, at 547-548). She described the "oldest child" as having "bruises and black eyes and swelling about the face" as if "she'd been in a boxing match and lost." (*Id.* at 548). When asked whether the "child was able to go to school with the injury that she had," Hoffman replied that "[s]he was kept home." (*Id.* at 549). She testified that Jessica kept a close eye on M.R.D. and always kept her close by. (*Id.*). When asked whether she remembered

other injuries on the girls, she responded that she did not. (*Id.* at 549). Hoffman testified that she was concerned about the facial injuries she observed. (*Id.* at 549-550).

{¶59} The State then offered the testimonies of a series of teachers, counselors, and principals who knew and interacted with M.R.D. and M.A.D. Angela Quitar ("Quitar"), one of M.R.D.'s former teachers, testified that she observed a bruise on one side of M.R.D.'s face and a cut on the other side. (*Id.* at 553, 556). Quitar testified that M.R.D. maintained that the injuries were caused by "rough housing * * * with her sisters." (*Id.* at 556). However, she stated that she ultimately contacted JFS in part because M.R.D. could not give a consistent answer as to how she suffered the injuries. (*Id.* at 554). Quitar testified that she met with Dayton and Jessica to discuss M.R.D.'s injuries and that Dayton and Jessica requested that they be informed of any concerns about injuries or abuse by phone or email. (*Id.* at 554-555).

{¶60} Next, Chris Hoehn ("Hoehn"), a former guidance counselor who worked with M.A.D., testified that one of M.A.D.'s teachers asked that he talk to her because they were "concerned about some bruising on her face. Her eyes were bloodshot, and [there was] a bump on her forehead." (*Id.* at 563-564). Hoehn testified that he did not communicate with Dayton concerning M.A.D.'s injuries. (*Id.* at 564).

{¶61} Megan McDaniel ("McDaniel"), one of M.R.D.'s fifth-grade teachers, testified that she interacted with M.R.D. on a daily basis throughout the 2013-2014 school year and that, on different occasions, she observed multiple injuries on M.R.D., including black and blue marks above her eye, bruises on her wrists, and bruises on her face. (*Id.* at 569-570). She testified that the injury to M.R.D.'s wrist "looked like hand imprints." (*Id.*). McDaniel testified that M.R.D. gave various reasons for the injuries; however, she called JFS because M.R.D.'s "stories weren't all adding up and * * * the bruises kept on coming." (*Id.* at 571-572). She testified that she did not speak with Dayton about M.R.D.'s injuries. (*Id.* at 572-573).

{¶62} Bethany Bentz ("Bentz") and Marguerite Hall ("Hall"), who were also M.R.D.'s fifth-grade teachers, offered similar testimony. Bentz testified that she frequently interacted with M.R.D. and that she observed injuries on M.R.D, including a bruise that looked like a hand print on M.R.D.'s arm and a cut on M.R.D.'s lip. (*Id.* at 576-577). She further testified that she reported M.R.D.'s injuries to JFS because M.R.D. did not tell her a consistent story as to how the injuries occurred and she had a "demeanor of fear" when discussing the injuries. (*Id.* at 577-578).

{¶63} Likewise, Hall testified that although she was initially satisfied with the explanation she received from M.R.D. concerning how she sustained an injury, Hall grew concerned when she received an email from Dayton saying that she was

not to speak to M.R.D. directly without a parent present. (*Id.* at 582-583). Hall testified that the email "raised a flag," and she identified State's Exhibit 26 as the email from Dayton. (*Id.* at 583, 585) (*See* State's Ex. 26).

{¶64} Angela Dillahunt ("Dillahunt"), a school counselor who interacted "very frequently" with M.R.D., testified that she observed injuries on M.R.D., including "scratches all [over] her face and her arms, and a bruise * * * on her cheek." (Dec. 12-16, 2016 Tr., Vol. IV, at 604-606). She also testified that M.R.D. offered inconsistent or contradictory explanations as to how she sustained the injuries. (*Id.* at 607). Dillahunt testified that she eventually reported M.R.D.'s injuries to JFS. (*Id.* at 606).

{¶65} On cross-examination, Dillahunt testified that she did not speak with Dayton or Jessica despite repeated attempts to call them. (*Id.* at 609). She testified that she received "a couple of E-mails back from Jessica" regarding her concerns about M.R.D.'s injuries. (*Id.*).

{¶66} Timothy Kannally ("Kannally"), the principal of a school formerly attended by both M.R.D. and M.A.D., testified that he was familiar with both M.A.D. and M.R.D. (*Id.* at 611-612). Kannally testified that M.R.D. exhibited injuries and told inconsistent stories about how she received the injuries. (*Id.* at 613-614). He identified State's Exhibits 27, 31, and 32 as photographs taken of M.R.D. by school officials which were submitted to JFS depicting bruises,

abrasions, and other marks on M.R.D.  (*Id.* at 614-615, 625-626).  (*See* State's Exs. 27, 31, 32).  Kannally identified State's Exhibit 28 as an email that he was forwarded concerning M.R.D. and M.A.D.  (Dec. 12-16, 2016 Tr., Vol. IV, at 618).  In the email, Dayton expresses his displeasure that M.R.D. and M.A.D. were taken out of their classrooms by a "Mrs. Hobbs" and asked whether they had beds, whether they were fed, whether they were left outside for long periods of time, and whether they were spanked.  (State's Ex. 28).  The email also indicates that Mrs. Hobbs "called [JFS] on [Jessica]" and that he and Jessica would not live their lives "walking on eggshells because [Mrs.] Hobbs wants to try to nail us for something."  (*Id.*). Kannally identified State's Exhibit 30 as an email from Dayton wherein Dayton expressed dissatisfaction that school officials questioned M.R.D. about certain injuries and reported the injuries to JFS without contacting either Dayton or Jessica first to verify the cause of the injuries.  (Dec. 12-16, 2016 Tr., Vol. IV, at 623-624). (*See* State's Ex. 30).  He testified that the email concerned him because Dayton had "established a pattern of * * * communicating with [school officials] his dissatisfaction when we contacted [JFS] and several times his correspondence indicated to me that he was just angry with us that we called [JFS]."  (Dec. 12-16, 2016 Tr., Vol. IV, at 624).  He identified State's Exhibit 33 as a note written by P.W. and given to her teacher identifying incidents of abuse perpetrated by Jessica

and State's Exhibits 34 and 35 as attendance records for M.R.D. and M.A.D, respectively. (*Id.* at 626-629). (*See* State's Ex. 33, 34, 35).

**{¶67}** On cross-examination, Kannally testified that the note that P.W. gave her teacher did not mention Dayton and did not indicate that Dayton was responsible for forcing M.R.D. and M.A.D. to hit each other. (Dec. 12-16, 2016 Tr., Vol. IV, at 631).

**{¶68}** Another of the State's witnesses, Dr. Monica Gilbert ("Dr. Gilbert"), a pediatrician, testified that she was familiar with M.A.D. and M.R.D. because they were "patients of [her] office for about five years" but that she "hadn't seen them frequently for the last couple years they were at [her] practice." (Dec. 12-16, 2016 Tr., Vol. III, at 517-518). Dr. Gilbert testified that she received a report that M.A.D. was engaging in self-harming behaviors, including "scratching herself until she bled[,] * * * banging her face into * * * bed posts[,] [and] * * * consum[ing] at least two bottles of ibuprofen." (*Id.* at 520). She testified that M.A.D. was not brought to the office to be treated for those injuries and that Dayton never asked for any referrals for the girls to be treated for other injuries they may have suffered. (*Id.* at 519-520). She testified that Dayton was responsible for bringing the girls to their appointments about ten percent of the time. (*Id.* at 521).

**{¶69}** On cross-examination, Dr. Gilbert testified that she did not notice injuries on M.R.D. and M.A.D. on "the days that [she] saw them" and that she is

required to report suspected child abuse. (*Id.* at 524). She also testified that the girls appeared well-fed and well-dressed during their appointments. (*Id.* at 523).

**{¶70}** On re-direct examination, Dr. Gilbert testified that, based on Jessica's reports of M.A.D.'s potential self-harm, she submitted a report to JFS. (*Id.* at 524-526).

**{¶71}** The State offered the testimony of former JFS investigators and supervisors. Danielle Swendal ("Swendal"), a former intake investigator and ongoing supervisor with JFS, testified that beginning in April 2010, JFS received approximately 18 intake reports concerning the Dayton family, some of which were received after the children were removed from Dayton and Jessica's care in 2015. (Dec. 12-16, 2016 Tr., Vol. III, at 484, 489). Swendal stated that many of these reports concerned suspected physical abuse. (*Id.* at 493-494).

**{¶72}** Likewise, Kathleen Albanese ("Albanese"), a former intake supervisor for JFS, testified that over the course of her employment with JFS, she knew of 21 reports concerning the Dayton family. (*Id.* at 527-528). Albanese testified that of those 21 reports, 11 were investigated further. (*Id.* at 529). She testified that some of those investigations concerned "chronic bruising on the children" and that sometimes "the allegation was that the children did it to each other." (*Id.* at 535). She testified that during the early stages of the investigations,

"[Dayton] was not alleged to have been the person who did the abuse directly." (*Id.* at 534).

**{¶73}** Albanese stated that she conducted an interview with Dayton after the children were removed from the home in 2015. (*Id.*). She testified that Dayton "was adamant that he had no knowledge of any abuse by Jessica toward the children" and that "he said he adamantly does not tolerate any abuse and would not tolerate any child abuse in his home." (*Id.* at 534-535). She also testified that Dayton denied seeing injuries on the children. (*Id.* at 535). However, she testified that, in connection with the removal and investigation in 2015, a caseworker learned from one of the children that "[Dayton] had observed Jessica hitting [M.A.D.] on one occasion, and that there was some threat of divorce over hitting the children." (*Id.* at 537). She found Dayton's claims that he did not see the bruising hard to believe because "[the] caseworkers saw bruises. There was [sic] even the school pictures, in the school picture book with bruises on one of the girls. Caseworkers saw bruises many times." (*Id.* at 540).

**{¶74}** The State also offered the testimony of a series of witnesses with experience and expertise in the area of child sexual and physical abuse. Dr. Farah Brink ("Dr. Brink") is a child-abuse pediatrician employed at Nationwide who saw P.W. during her visit to Nationwide in 2013. (Dec. 12-16, 2016 Tr., Vol. VI, at 1014-1015, 1024). Dr. Brink testified that P.W. was brought to Nationwide over

concerns of sexual abuse and that she underwent a forensic interview. (*Id.* at 1025). Dr. Brink participated in physical examinations of P.W. which were "normal," meaning there was no evidence of "acute or old injury." (*Id.* at 1026-1027). However, she testified that a "normal" examination does not foreclose the possibility that a child was sexually abused. (*Id.* at 1027). She testified that the staff at Nationwide did not make any recommendations for a further course of treatment for P.W. (*Id.* at 1029). Dr. Brink testified that children who come to Nationwide on referrals of potential sexual abuse sometimes change their statements once they arrive—that is, they will disclose sexual abuse before arriving at the hospital but they may change their story or fail to further disclose abuse once they arrive there. (*Id.* at 1032-1033). However, Dr. Brink emphasized that failure to disclose at Nationwide "may not mean necessarily that their prior disclosure didn't occur." (*Id.* at 1033).

{¶75} On cross-examination, Dr. Brink read from a portion of a report produced at Nationwide which stated that "[P.W.] denied that something has happened to her body or that she has had to touch somebody else's body." (*Id.* at 1035). She also reiterated that her physical exam of P.W. did not reveal evidence of sexual abuse but that the absence of physical signs in an examination is not conclusive evidence that sexual abuse did not occur. (*Id.* at 1036).

{¶76} Jennifer Sherfield ("Sherfield"), a social worker employed as a licensed forensic interviewer and mental health advocate at Nationwide, testified that she conducted a forensic interview with P.W. when she was brought into Nationwide in April 2013. (*Id.* at 1038-1039, 1042). Sherfield testified that it was her understanding that P.W. disclosed sexual abuse prior to attending the forensic interview. (*Id.* at 1043). She testified that although P.W. did not disclose any sexual abuse during the course of the forensic interview which confirmed her earlier disclosure, she said things during the course of the interview that were concerning such as the "fact that she thought something had happened with [Dayton]. That she was scared she wasn't going to see [Jessica] again." (*Id.* at 1043-1044). She testified that "it wouldn't necessarily be uncommon for a kid to have disclosed prior to coming to [Nationwide] and then not disclose at [Nationwide]." (*Id.* at 1047).

{¶77} On cross-examination, Sherfield testified that no additional action was taken following the interview with P.W. (*Id.* at 1050-1051).

{¶78} On re-direct examination, Sherfield testified that Jessica accompanied P.W. to Nationwide for the interview. (*Id.* at 1051).

{¶79} The State next offered the testimony of Kerri Wilkinson ("Wilkinson"), a licensed social worker employed at Nationwide, who conducted a forensic interview with P.W. when she was brought to Nationwide by Jessica in 2010 following a different allegation of sexual abuse. (*Id.* at 1053-1056).

Wilkinson identified State's Exhibit 40 as a recording of her 2010 interview with P.W., which was subsequently played for the jury. (*Id.* at 1067-1068). She confirmed that P.W. did not disclose any instances of sexual abuse or of "anything happening to her body" during the course of the interview. (*Id.* at 1070).

{¶80} On cross-examination, Wilkinson confirmed that P.W. made no disclosure of abuse during the 2010 interview. (*Id.* at 1073).

{¶81} On re-direct examination, Wilkinson testified that any failure to disclose during a forensic interview "just means during [the] interview with the child, the child didn't give any history of being abused." (*Id.* at 1074). She testified that a child could disclose before or after an interview even if they failed to disclose during the interview. (*Id.*).

{¶82} Cindy Kuhr ("Kuhr"), a Victim Specialist Consultant who worked for BCI, testified that victims of child-sexual abuse may, for a variety of reasons, delay disclosing the abuse. (*Id.* at 1165). She testified that victims of child-sexual abuse can recant their statements after having previously disclosed abuse despite the fact that they were actually abused. (*See id.* at 1166-1168).

{¶83} On re-direct examination, Kuhr testified that "recantation can occur primarily when they feel they're not being supported." (*Id.* at 1182).

{¶84} On re-cross-examination, Kuhr testified that it is possible that a "friend or relative" could tell a child what to say concerning sexual abuse. (*Id.* at 1188).

However, she testified that forensic interviews with suspected victims of child-sexual abuse are designed to determine if "the information they're giving is factual." (*Id.*). She testified that if a child does not disclose during a forensic interview, it "is not safe to say" that no abuse occurred. (*Id.* at 1189).

**{¶85}** Thereafter, the State moved to admit its exhibits and rested. (Dec. 12-16, 2016 Tr., Vol. VII, at 1266-1302). State's Exhibits 1 through 12, 16 through 19, 26, 27, and 30 through 37 were admitted without objection. (*See id.* at 1266-1267, 1276-1277, 1279, 1284-1286). State's Exhibits 14, 22, 24-25, 28, and 40 were admitted over the defense's objection. (*See id.* at 1270, 1279-1285, 1289-1291). State's Exhibits 13, 15, 20, 23, 29, 38, 39, 42, and 43 were excluded. (*See id.* at 1268, 1270-1271, 1276, 1278, 1282-1283, 1285, 1287-1288, 1293-1294). State's Exhibits 41 and 45 were proffered. (*See id.* at 1291, 1301-1302). The State did not move to admit State's Exhibits 21 or 44. (*See id.* at 1279, 1294). Next, Dayton made a Crim.R. 29 motion, which the trial court granted as to Count One and denied as to Counts Two through Eleven. (*Id.* at 1302, 1307-1308, 1315).

**{¶86}** As his first witness, Dayton offered the testimony of his mother, Jacqueline Drukemiller ("Drukemiller"). (*Id.* at 1321-1322). When asked whether she noticed anything "amiss" at Dayton's residence when the family moved to Union County, Drukemiller testified "[n]ot at first, no." (*Id.* at 1354). However, she testified that she eventually began to notice changes in M.R.D.'s and M.A.D.'s

behavior around 2014. (*Id.* at 1355). She testified that whereas they once used to give family members hugs, "they weren't doing that anymore" and that they "kept looking at Jessica." (*Id.*). She also noticed that the children began sitting close to Jessica where they had not previously done so. (*Id.*). When she asked the girls whether anything was wrong, they told her that they were doing "fine." (*Id.* at 1356). She testified that although she never previously observed any aggressive behavior between M.R.D. and M.A.D., she began receiving phone calls from Dayton that the girls had started fighting, that he was upset, and that he did not know what to do. (*Id.* at 1356-1357). Drukemiller testified that when she visited Dayton's residence to speak to M.R.D. and M.A.D. about their fights, she observed M.R.D. with a black eye; when she asked M.R.D. how she got the black eye, she said that she was injured while fighting with M.A.D. (*Id.* at 1358).

**{¶87}** Drukemiller testified that Jessica showed her one of the videotaped episodes of M.R.D. and M.A.D. fighting. (*Id.* at 1371). She stated that "in [her] opinion it looked like it was being orchestrated." (*Id.* at 1372). She testified that she asked Jessica why she videotaped M.R.D. and M.A.D. fighting and why she did not try to break up the fight. (*Id.*). She testified that, after hearing Jessica's explanation for recording the fight without attempting to break it up, she "was pretty angry at [Jessica]." (*Id.*). Drukemiller testified that Jessica would not accept any suggestions as to how to stop the girls from fighting and that Jessica's stance on

accepting advice was odd given how upset she said she was that the girls were constantly fighting. (*Id.* at 1373). She testified that "[Dayton] wasn't anywhere around" when Jessica showed her the video. (*Id.* at 1372).

{¶88} Further, Drukemiller testified that M.R.D. and M.A.D. did not tell her that they were being beaten or forced to fight one another. (*Id.* at 1375). When asked whether she thought Dayton knew what was happening in his house and whether he participated in the abuse, she responded "[a]bsolutely not." (*Id.* at 1387-1388).

{¶89} On cross-examination, Drukemiller testified that M.R.D. and M.A.D. were sent to visit their biological mother in Nevada in 2010 and that she later learned that Dayton was under investigation for the sexual abuse of P.W. during the same approximate time period. (Dec. 12-16, 2016 Tr., Vol. VIII, at 1403). As to the fights videotaped by Jessica, she testified that she "admonished" Jessica for not breaking up the fights and told her that "[t]his needs to stop. You need to start breaking these fights up." (*Id.* at 1426). She also testified that, because she is employed in a school, she is a "mandated reporter"—a person who must report suspected child abuse to authorities. (*Id.* at 1425-1426). However, Drukemiller testified that she did not report M.R.D.'s or M.A.D.'s injuries, even after she saw the video recording of M.A.D. and M.R.D. fighting, because she was satisfied with the answers she received as to how M.R.D. and M.A.D. sustained the injuries. (*Id.*

at 1426). She testified that she did not initially believe M.R.D.'s and M.A.D.'s allegations because she "didn't hear [the allegations] from [her] grandchildren," and she suggested that she still did not believe P.W.'s allegations of sexual abuse because Drukemiller thinks that P.W.'s "grandmother put her up to it." (*Id.* at 1429-1430).

**{¶90}** Finally, Dayton testified in his defense. (*Id.* at 1458). Dayton testified about his work schedule and other responsibilities which took him away from home and from M.R.D. and M.A.D. (*See id.* at 1486-1489, 1497-1499). Dayton testified that, sometime in 2013, he began noticing that M.A.D. and M.R.D. started fighting with each other. (*Id.* at 1499). He testified that the fighting started as verbal confrontations and that neither girl sustained serious injuries. (*Id.* at 1500-1501). He testified that he received reports from teachers and others about M.A.D.'s and M.R.D.'s injuries but that he thought they were just fighting on their own. (*Id.* at 1503). Dayton said that, because Jessica and the other children consistently told him that M.R.D. and M.A.D. were fighting, "who [was he] to question all these people." (*Id.* at 1510). According to Dayton, "[n]o one ever told [him] that [M.R.D. and M.A.D.] were put up to fight." (*Id.* at 1515). He remarked that "having six people telling [him] the same story, what else [was he] supposed to believe [other than] that two girls are fighting." (*Id.* at 1510). He testified that he noticed injuries

on the girls but "assumed it was from when the two girls were fighting." (*Id.* at 1506). He also testified that he "saw the black eye." (*Id.* at 1543).

**{¶91}** Dayton disputed P.W.'s account that he was there during some of the abuse stating: "I was not there for any of it." (*Id.* at 1539). He admitted that he was present for some of the fighting between M.A.D. and M.R.D. and that he would try to stop it. (*Id.* at 1539). (*See also id.* at 1503, 1512). He testified that he "never [saw] Jessica hit the kids." (*Id.* at 1501). Although he testified that he knew that Jessica concealed M.R.D.'s and M.A.D.'s injuries with makeup, he stated that he did not think that the injuries were caused by Jessica's intentional abuse. (*Id.* at 1506). He acknowledged that Jessica showed him "a few seconds" of one of the videos depicting M.R.D. and M.A.D. fighting. (*Id.* at 1539-1540). He testified that he did not "know how [Jessica] would record all those videos and not step in and stop them." (*Id.* at 1541). He stated that he did not see the video of M.R.D. and M.A.D. being forced to eat SPAM but that he had heard about the incident; he also testified that he did not see the video of M.R.D. and M.A.D. stomping on each other's feet. (*Id.* at 1541-1542).

**{¶92}** Further, Dayton testified that he believed that the hole in the girls' bathroom wall—as depicted in State's Exhibit 2—was caused by M.R.D. and M.A.D. fighting. (*Id.* at 1545-1547) (*See* State's Ex. 2). He testified that he was at home when the hole depicted in State's Exhibit 4 was created. (Dec. 12-16, 2016

Tr., Vol. VIII, at 1549). He stated that he was upstairs and that he came downstairs after hearing the noise; he believed at the time that it was caused by someone falling into the wall. (*Id.* at 1549-1550).

{¶93} Dayton denied that he unzipped P.W.'s pajamas and licked her breast. (*Id.* at 1490-1491). (*See also id.* at 1574). He opined that P.W. fabricated the accusations so that she could live full time with her biological father. (*Id.* at 1495-1496).

{¶94} On cross-examination, Dayton confirmed that he sent M.R.D. and M.A.D. to visit family in Nevada in 2010 and that this visit coincided with a JFS investigation of Dayton and Jessica for medical neglect. (*Id.* at 1582). He testified that he initially did not believe the children were being abused because he only heard about the reports of abuse through JFS but that he would have believed the children if they told him directly. (*Id.* at 1593-1594). He admitted that he witnessed M.A.D.'s black eye but that he did not know that she was held back from school on multiple days for her injuries, and he maintained that he believed the injury was caused by M.A.D. fighting with M.R.D. (*Id.* at 1594-1595). (*See also id.* at 1616-1617). He testified that he did not remember seeing the girls walk around "with their toes curled under" when he was around. (*Id.* at 1606). He testified that he did not see M.A.D.'s and M.R.D.'s injuries when they were forced to hit each other in the "privates" with a water bottle, that he did not see the injury to M.R.D.'s head

caused when she was struck with a belt buckle, and that he did not see the injuries the girls suffered when their heads were banged into the bathroom wall. (*Id.* at 1612-1613). He denied that M.A.D. and M.R.D. were bruised "almost every day." (*Id.* at 1613). He admitted that he saw that some of M.A.D.'s and M.R.D.'s injuries were concealed with makeup. (*Id.* at 1613). He admitted that he saw video footage of the girls fighting but explained that he only saw "three or four seconds" of the footage. (*Id.* at 1613). He further testified that he saw only one of the recordings before Jessica's sentencing hearing. (*Id.* at 1613-1614). He testified that he did not suspect that the girls were being abused because he was told that the injuries were caused by fighting between M.A.D. and M.R.D. and that he had no cause to believe otherwise. (*Id.* at 1614). Dayton stated that he did not think that any of the injuries, including the bruising and black eyes, were significant enough to require hospitalization and that he did not think that the injuries "distorted" any of his children's appearances. (*Id.* at 1617-1618).

{¶95} Thereafter, the defense moved to admit Defendant's Exhibits A-O, which were admitted without objection.[3] (*Id.* at 1623-1624). The State did not present any additional witnesses on rebuttal, and Dayton renewed his Crim.R. 29(A) motion, which the trial court denied. (*Id.* at 1624-1625). The matter was submitted

---

[3] Defendant's Exhibits A-O are identical to State's Exhibits 2-12, 17-18, 25-28, and 31-32. Dayton appears to have used some letters multiple times to label his exhibits. Defendant's Exhibit F corresponds with both State's Exhibits 6 and 7, Defendant's Exhibit L corresponds with both State's Exhibits 17 and 26, and Defendant's Exhibit M corresponds with State's Exhibits 18, 27, and 28.

to the jury, which found Dayton guilty as to Counts Two through Eleven of the indictment. (*Id.* at 1731-1738).

**{¶96}** We first review the sufficiency of the evidence supporting Dayton's gross-sexual-imposition, endangering-children, complicity-to-endangering-children, and permitting-child-abuse convictions. *State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999).

**{¶97}** First, Dayton fails to make an argument as to how his gross-sexual-imposition conviction is based on insufficient evidence. "'App.R. 12(A)(2) provides that an appellate court "may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)."'" *State v. Stevens*, 3d Dist. Allen No. 1-14-58, 2016-Ohio-446, ¶ 82, quoting *State v. Jackson*, 10th Dist. Franklin No. 14AP-670, 2015-Ohio-3322, ¶ 11, quoting App.R. 12(A)(2). "'Moreover, "[i]f an argument exists that can support [an] assignment of error, it is not this court's duty to root it out."'" *Id.* at ¶ 81, quoting *State v. Stelzer*, 9th Dist. Summit No. 23174, 2006-Ohio-6912, ¶ 7, quoting *State v. Cook*, 9th Dist. Summit No. 20675, 2002-Ohio-2646, ¶ 27. Accordingly, we will not address the sufficiency of the evidence supporting that

conviction. *See* App.R. 12(A)(2); App.R. 16(A). *See also State v. Olvera-Guillen*, 12th Dist. Butler No. CA2007-05-118, 2008-Ohio-5416, ¶ 10.

**{¶98}** Second, turning to Dayton's endangering-children, complicity-to-endangering-children, and permitting-child-abuse convictions, Dayton argues only that the State failed to prove that he possessed the requisite culpable mental states to sustain those convictions. As such, we will address only the culpable-mental-state requirement of each offense. *See State v. Dillon*, 4th Dist. Washington No. 11CA31, 2013-Ohio-614, ¶ 13.

**{¶99}** As previously noted, to sustain convictions under R.C. 2919.22(A) and 2903.15(A), the State was required to prove that Dayton was reckless. *See McGee*, 79 Ohio St.3d at 195; *Ferguson*, 2011-Ohio-4285, at ¶ 27. Similarly, because R.C. 2923.03(A)(2) requires the State to show that an aider or abettor acted with the same kind of culpability required for the commission of an offense and because recklessness is the culpable mental state required for endangering children under R.C. 2919.22(B)(2), the State was required to prove that Dayton recklessly aided or abetted Jessica's abuse of M.R.D. and M.A.D. *See Diggs*, 2014-Ohio-3340, at ¶ 26. *See also State v. Thiel*, 3d Dist. Wyandot No. 16-16-01, 2017-Ohio-242, ¶ 140-143.

**{¶100}** The State presented sufficient evidence from which any rational trier of fact could conclude that Dayton violated his duty to protect M.R.D. and M.A.D. from abuse by disregarding a substantial and unjustifiable risk that M.R.D. and

M.A.D. were being abused, that, in failing to heed the substantial risk that Jessica was abusing M.R.D. and M.A.D., Dayton recklessly assisted Jessica in her years-long abuse of M.R.D. and M.A.D., and that his failure to intervene amounted to recklessly permitting M.R.D.'s and M.A.D.'s abuse. *See State v. Hinojosa*, 3d Dist. Seneca No. 13-12-41, 2013-Ohio-4110, ¶ 35-38. First, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have concluded that Dayton actually knew that Jessica was abusing M.R.D. and M.A.D. P.W. testified that Dayton once "saw [Jessica] bash [M.A.D.'s] head into the wall." (Dec. 12-16, 2016 Tr., Vol. VI, at 1092). P.W. also testified that Jessica once made M.R.D. and M.A.D. hit each other in the "private parts" with water bottles and that they were later forced to show Dayton their injuries. (*Id.* at 1096-1097). Thus, from P.W.'s testimony alone, a rational trier of fact could find that Dayton left M.R.D. and M.A.D. in Jessica's care knowing that Jessica had abused the girls and that the girls were at further risk of abuse. *See State v. Garcia*, 10th Dist. Franklin No. 03AP-384, 2004-Ohio-1409, ¶ 28 (noting that "[w]hen recklessness is an element of an offense, knowledge * * * is also sufficient culpability to establish this element"), citing R.C. 2901.22(E). However, putting aside P.W.'s testimony as to Dayton's direct knowledge of incidents of abuse perpetrated by Jessica, the State produced sufficient evidence that Dayton was *aware* of a substantial and unjustifiable risk that Jessica was abusing M.R.D. and M.A.D.

{¶101} The State offered the testimony of numerous witnesses who testified about their suspicions and concerns regarding the injuries they observed on M.R.D. and M.A.D. Teachers, counselors, and other educators familiar with M.R.D. and M.A.D. testified that they frequently observed injuries on the two girls. Representatives from JFS testified about the many reports that the agency received regarding suspected physical abuse in the Dayton household. Dayton's grandmother testified that the injuries she observed on the girls led her to believe they were being abused. Dayton himself conceded that he saw the girls' injuries, including black eyes on both, and that he knew Jessica actively attempted to conceal the injuries with makeup. Dayton also testified that he viewed a segment of a video recording of M.R.D. and M.A.D. fighting with each other. Drukemiller, Dayton's mother, testified that she viewed video recordings similar to the one viewed by Dayton and that the recordings gave her the impression that Jessica was orchestrating M.R.D. and M.A.D.'s fights. Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could conclude that there was a substantial, unjustifiable, and readily cognizable risk that M.R.D. and M.A.D. were being abused by Jessica, that Dayton was aware of this risk, and that he disregarded it over the course of many years. As such, we conclude that Dayton's endangering-children, complicity-to-endangering-children, and permitting-child-abuse convictions are supported by sufficient evidence.

{¶102} Having concluded that Dayton's endangering-children, complicity-to-endangering-children, and permitting-child-abuse convictions are based on sufficient evidence, we next address Dayton's argument that his gross-sexual-imposition, endangering-children, complicity-to-endangering-children, and permitting-child-abuse convictions are against the manifest weight of the evidence. *Velez*, 2014-Ohio-1788, at ¶ 76. We will begin by addressing whether Dayton's gross-sexual-imposition conviction is against the manifest weight of the evidence, then we will address together whether his endangering-children, complicity-to-endangering-children, and permitting-child-abuse convictions are against the manifest weight of the evidence.

{¶103} In support of his argument that his gross-sexual-imposition conviction is against the manifest weight of the evidence, Dayton suggests that P.W. fabricated her allegation of abuse in an effort to live with her father full-time in Michigan and, as such, P.W.'s testimony is not credible. Further, Dayton argues that P.W.'s testimony is rendered suspicious and unreliable because she did not disclose the alleged sexual abuse during the 2013 forensic interview at Nationwide despite having made an earlier allegation of sexual abuse. Dayton's arguments lack merit. Although P.W.'s trial testimony of sexual abuse was inconsistent with her earlier nondisclosure of sexual abuse during the 2013 forensic interview, "'"[a] defendant is not entitled to a reversal on manifest weight grounds merely because

inconsistent evidence was presented at trial.'"'" *State v. Barrie*, 10th Dist. Franklin No. 15AP-848, 2016-Ohio-5640, ¶ 22, quoting *State v. Jackson*, 10th Dist. Franklin No. 14AP-670, 2015-Ohio-3322, ¶ 17, quoting *State v. Chandler*, 10th Dist. Franklin No. 05AP-415, 2006-Ohio-2070, ¶ 9. "A jury may take into consideration a witness's conflicting testimony in determining his or her credibility and the persuasiveness of his or her account by either discounting or resolving the discrepancies." *Id.*, citing *Jackson* at ¶ 17, citing *State v. Taylor*, 10th Dist. Franklin No. 14AP-254, 2015-Ohio-2490, ¶ 34. "'A jury, as finder of fact, may believe all, part, or none of a witness's testimony.'" *Id.*, quoting *Taylor* at ¶ 34.

**{¶104}** Although P.W.'s trial testimony was inconsistent with her earlier nondisclosures, she explained the inconsistency. P.W. testified that the reason she did not disclose Dayton's sexual abuse during the forensic interview at Nationwide in 2013 was because Jessica spoke with her while Dayton was in the same room and pressured her not to disclose the abuse by telling P.W. that the family's reputation would be tarnished if she followed through with the allegations. Because P.W. offered an explanation for why she did not disclose the abuse during the 2013 forensic interview at Nationwide, the jury had more context with which to judge her credibility. *See State v. Stairhime*, 3d Dist. Defiance No. 4-13-06, 2014-Ohio-1791, ¶ 36. Moreover, that P.W. did not disclose any sexual abuse during the course of the forensic interview is consistent with the testimony offered by Dr. Brink,

Sherfield, Wilkinson, and Kuhr that nondisclosure in a forensic interview does not mean that abuse did not happen, that children often recant their earlier disclosures of abuse, and that they often recant or delay disclosure after being pressured by a family member to do so. *See State v. J.E.C., Jr.*, 10th Dist. Franklin No. 12AP-584, 2013-Ohio-1909, ¶ 43 (suggesting that testimony concerning the "difficulty children have in disclosing sex abuse and the fact that disclosure is a process whereby children do not reveal all the facts at once" can be used by a jury to assess the credibility of a testifying victim who earlier equivocated about or did not disclose sexual abuse). Finally, P.W. was unwavering in her testimony that Dayton unzipped her pajamas and licked her chest as she described, and ultimately, the testimony of a single witness, if believed by the jury, can support a criminal conviction. *Barrie* at ¶ 21.

{¶105} The jury was aware of Dayton's assertions that P.W. fabricated her allegations of sexual abuse. Dayton and Drukemiller testified to that theory. Further, Jessica, P.W.'s mother, testified that she did not believe P.W.'s allegations that Dayton sexually abused her. Finally, Dayton emphatically denied that he sexually abused P.W. In the end, the jury elected to discount Dayton's theory concerning P.W.'s disclosure of sexual abuse, disbelieve Dayton's testimony that he did not abuse P.W., and credit P.W.'s testimony. *See State v. Jackson*, 8th Dist. Cuyahoga No. 93235, 2010-Ohio-3716, ¶ 14-16; *State v. Anderson*, 9th Dist.

Summit No. 23197, 2007-Ohio-147, ¶ 15, 27; *State v. Hart*, 57 Ohio App.3d 4, 8-9 (6th Dist.1988). Altogether, even when we do not view the evidence in a light most favorable to the prosecution, "this is not an exceptional case where the evidence weighs heavily against the convictions." *State v. Suffel*, 3d Dist. Paulding No. 11-14-05, 2015-Ohio-222, ¶ 33.

{¶106} Next, we consider whether Dayton's endangering-children, complicity-to-endangering-children, and permitting-child-abuse convictions are against the manifest weight of the evidence. In attacking the weight of the evidence supporting these convictions, Dayton makes the same argument that he makes in support of his sufficiency-of-the-evidence argument. That is, Dayton argues that the weight of the evidence supporting whether he possessed the requisite culpable mental state—recklessness—for each offense is outweighed by the evidence that he did not act recklessly. *See State v. Frye*, 3d Dist. Allen No. 1-17-30, 2018-Ohio-894, ¶ 56.

{¶107} In support of his argument, Dayton points to the considerable testimony concerning his "ambitious work schedule and his frequent and prolonged absences from the home." (Appellant's Brief at 8). He highlights that "[i]n addition to working from 6:00 a.m. to 3:00 p.m. for Honda during the final years, he was refereeing soccer games year-round" and that there was no "testimony by any of the witnesses to suggest that he * * * spent the amount of quality time with his children

as the teachers and witnesses presented by the State." (*Id.* at 9). Further, he argues that "[M.A.D.], [M.R.D.], [I.D.] and [M.D.] all testified that [Dayton] was working excessively and that he was not present when their mother was encouraging and/or forcing [M.A.D.] and [M.R.D.] to fight or when she physically abused them." (*Id.* at 13). Finally, he notes that "[b]oth [M.A.D.] and [M.R.D.] testified they never told their father what was happening to them. They both testified that they told their father that they were fighting with no further elaboration as to why the fights were occurring. The girls consistently told this story to everyone they knew." (*Id.* at 8).

{¶108} Notwithstanding these arguments, Dayton gives little consideration to the extensive testimony of neighbors, family members, teachers, counselors, and social workers who expressed concerns to Dayton about the frequency and severity of M.R.D.'s and M.A.D.'s injuries. While Dayton admits that he observed M.R.D.'s and M.A.D.'s injuries "from time to time," his argument omits a discussion of the severity and chronic nature of M.R.D.'s and M.A.D.'s injuries. Although he disputed that M.R.D. and M.A.D. were bruised every day, M.R.D., M.A.D., P.W., and Jessica testified that M.R.D. and M.A.D. were injured at least two to three times a week. M.A.D. testified that she was in pain almost every day. In addition, while there was considerable testimony that Dayton was frequently absent from the home, multiple witnesses testified that Dayton would make it home a few nights a week to eat dinner with the family and interact with his children.

{¶109} Furthermore, the record is brimming with additional examples of Dayton's "willful blindness and heedless indifference to the strong possibility" that M.R.D. and M.A.D. were being repeatedly abused. *See Hinojosa*, 2013-Ohio-4110, at ¶ 36. Dayton admitted to viewing a clip of at least one of the videos depicting M.R.D. and M.A.D. fighting. Jessica testified that she showed him segments of multiple videos documenting the two girls fighting with each other. One of these videos left Drukemiller with the impression that Jessica was orchestrating the fights. The jury was given the opportunity to view these videos. Moreover, Dayton testified that he was present in the home when the hole was made in the wall, a hole which, according to the testimony of a few of the Dayton children, was caused when Jessica pushed M.A.D.'s head into the wall. Finally, Dayton was aware that Jessica often attempted to hide M.R.D.'s and M.A.D.'s injuries with makeup.

{¶110} The jury also considered evidence that Dayton expressed concerns that people would think M.R.D. and M.A.D. were being abused and that, on multiple occasions, he was angry with school personnel for talking to M.R.D. and M.A.D. about their injuries without first talking to him or Jessica about the how the girls sustained their injuries. Finally, the jury heard testimony suggesting that Dayton may have had actual knowledge of Jessica's abuse of M.R.D. and M.A.D. Jessica, Drukemiller, and Dayton testified that M.R.D. and M.A.D. were sent to visit their mother and aunt in 2010—a time which coincided with an ongoing JFS

investigation. In addition, P.W. testified that Dayton once saw Jessica "bash" M.A.D.'s head into a wall and that M.R.D. and M.A.D. were forced to show Dayton injuries they suffered when Jessica made them hit each other in the "private parts" with water bottles.

{¶111} In sum, the State presented considerable evidence to the effect that most everyone who regularly interacted with M.R.D. and M.A.D. during the period in question strongly suspected that M.R.D. and M.A.D. were being abused. Thus, because the jury could have reasonably inferred that Dayton either knew that M.R.D. and M.A.D. were being abused or recognized a substantial risk that they were being abused and because Dayton did not intervene, the jury's conclusion that Dayton was reckless is not against the manifest weight of the evidence.

{¶112} Therefore, having weighed the evidence and all reasonable inferences, and considering the credibility of the witnesses, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that Dayton's gross-sexual-imposition, endangering-children, complicity-to-endangering-children, and permitting-child-abuse convictions must be reversed.

{¶113} Dayton's first assignment of error is, therefore, overruled.

**Assignment of Error No. II**

**The Defendant-Appellant was Denied the Effective Assistance of Counsel at Trial, in Violation of his Sixth Amendment Rights.**

## Assignment of Error No. III

**The Trial Court Committed Plain Error by Failing to Include the Mandatory Accomplice Testimony Instruction under Ohio Rev. Code Ann. § 2923.03(D).**

{¶114} In his second assignment of error, Dayton argues that he was denied the effective assistance of counsel at his trial. Specifically, Dayton argues that by failing to request an accomplice testimony jury instruction under R.C. 2923.03(D) or object to its omission, his trial counsel's performance fell below the standard of competent legal representation and prejudiced the outcome of his trial. In his third assignment of error, Dayton argues that, notwithstanding his trial counsel's failure to object to the omission of the R.C. 2923.03(D) instruction, the trial court committed plain error by failing to include the instruction.

{¶115} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland*, 466 U.S. at 689. Counsel is entitled to a strong presumption that all decisions fall within the

wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976), *vacated in part on other grounds*, 438 U.S. 910 (1978).

**{¶116}** Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

**{¶117}** "Ordinarily, the trial court has discretion to decide to give or refuse a particular instruction, and an appellate court will not disturb that decision absent an abuse of discretion." *State v. Teitelbaum*, 10th Dist. Franklin No. 14AP-310, 2016-Ohio-3524, ¶ 127, citing *Clark v. Grant Med. Ctr.*, 10th Dist. Franklin No. 14AP-833, 2015-Ohio-4958, ¶ 50. An abuse of discretion is more than a mere error in judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

{¶118} R.C. 2923.03(D) sets forth the jury instruction at issue. R.C. 2923.03(D) provides:

> If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:
>
> "The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
>
> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

"Courts have held that 'despite the mandatory nature of R.C. 2923.03(D), the statute only requires substantial, not strict, compliance.'" *State v. Holton*, 3d Dist. Logan No. 8-17-02, 2017-Ohio-6934, ¶ 40, quoting *State v. Woodson*, 10th Dist. Franklin No. 03AP-736, 2004-Ohio-5713, ¶ 17.

{¶119} In this case, Dayton was charged with two counts of complicity to endangering children under R.C. 2923.03(A) and 2919.22(B)(2). Jessica, Dayton's claimed accomplice, testified as the court's witness under Evid.R. 614(A). Therefore, to the extent that Jessica's testimony could implicate Dayton as an aider or abettor of her torture and abuse of M.R.D. and M.A.D., the trial court was required to furnish the jury with an instruction substantially similar in form to the one contained in R.C. 2923.03(D). *See State v. Ramsey*, 8th Dist. Cuyahoga No. 83026, 2004-Ohio-3618, ¶ 49 (noting that the policy behind the practice of giving jury instructions like the one in R.C. 2923.03(D) is "to alert the jury to the possibility of perjured testimony" such that "the charge should be given whether the accomplice testifies for the defense or the prosecution"), citing *United States v. Nolte*, 440 F.2d 1124, 1126 (5th Cir.1971).

{¶120} Here, the trial court failed to provide the jury with an instruction substantially similar in form to the one set forth in R.C. 2923.03(D). However, Dayton's trial counsel did not ask the trial court to issue the R.C. 2923.03(D) instruction or object to its omission. Because Dayton's trial counsel failed to object to the omission of the R.C. 2923.03(D) instruction, we review the trial court's failure to include the R.C. 2923.03(D) instruction for plain error.

{¶121} We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'"

*State v. Landrum*, 53 Ohio St.3d 107, 110 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the plain error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), citing *State v. Moreland*, 50 Ohio St.3d 58 (1990).

{¶122} Dayton contends that his trial counsel was ineffective for failing to either request the R.C. 2923.03(D) jury instruction or object to its omission. Even if Dayton's trial counsel's performance was deficient or unreasonable under the circumstances, we conclude that Dayton's claim of ineffective assistance of counsel is without merit because Dayton cannot demonstrate that there is a reasonable probability that, but for his trial counsel's unprofessional errors, the result of his trial would have been different. *See Holton*, 2017-Ohio-6934, at ¶ 48, citing *Bradley*, 42 Ohio St.3d at 143, quoting *Strickland,* 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance of counsel claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). Although Dayton points to portions of Jessica's testimony which he claims are harmful to his defense, the

elements of Jessica's testimony most detrimental to Dayton's case are at least partially corroborated by other witnesses, including Dayton himself. For example, Jessica testified that she showed Dayton a few seconds of "two or three" of the recordings she had made of M.R.D. and M.A.D. fighting each other. (Dec. 12-16, 2016 Tr., Vol. II, at 304). For his part, Dayton testified that he only saw "three or four seconds" of one of the recordings Jessica made. (Dec. 12-16, 2016 Tr., Vol. VIII, at 1539-1540, 1613). While it is true that Dayton's testimony is somewhat at variance with Jessica's, Dayton's testimony corroborates the most damaging aspect of Jessica's testimony: that Dayton knew that Jessica recorded M.R.D. and M.A.D. fighting and that he viewed the footage. Additionally, Jessica testified that Dayton almost certainly saw M.R.D.'s and M.A.D.'s injuries, including the black eyes. She also testified that although Dayton was often working, he still interacted with the girls "two or three nights a week." (Dec. 12-16, 2016 Tr., Vol. II, at 341). Dayton's testimony that he saw M.R.D.'s and M.A.D.'s injuries, including the black eyes, and that he spent time at the house with the family whenever he was not working or refereeing soccer games supports Jessica's testimony. Finally, Jessica testified that she and Dayton jointly sent M.R.D. and M.A.D. out of state in 2010 and that the time M.R.D. and M.A.D. were out of state coincided with an investigation by JFS. Drukemiller and Dayton corroborated Jessica's testimony in this respect. (*See* Dec. 12-16, 2016 Tr., Vol. VIII, at 1403, 1582).

{¶123} Moreover, Dayton completely ignores that Jessica's testimony was favorable to his defense. Jessica's testimony, rather than implicating Dayton in her abuse of M.R.D. and M.A.D., largely shielded Dayton and minimized any knowledge Dayton may have had concerning the abuse that was taking place in his home. For example, Jessica testified that M.R.D. and M.A.D. rarely fought when Dayton was home. She stated that they never fought at her instruction while Dayton was home. When asked where Dayton was during the times that she allowed or encouraged M.R.D. and M.A.D. to fight, Jessica responded that he was "[g]one at work mostly." (Dec. 12-16, 2016 Tr., Vol. III, at 410). She testified that she asked M.R.D. and M.A.D. to conceal that she was encouraging them to fight. She testified that she did "[e]verything [she] could" to hide the girls' fighting and injuries from Dayton. (*Id.* at 403). Jessica also insisted that Dayton did not know about the extent of the abuse or that she was the one encouraging M.R.D. and M.A.D. to fight. She testified that she never told Dayton that she was abusing M.A.D. and M.R.D. Because Jessica's testimony was corroborated by other witnesses and generally protective of Dayton, Jessica's testimony was not unfavorable to Dayton; thus, the trial court's failure to give the R.C. 2923.03(D) instruction is harmless. *State v. Harrison*, 3d Dist. Logan No. 8-14-16, 2015-Ohio-1419, ¶ 91. For this reason, we conclude that Dayton's trial counsel's failure to request the R.C. 2923.03(D)

instruction or object to its omission did not constitute ineffective assistance of counsel. *See id.*

{¶124} Turning to whether the trial court's failure to include the accomplice testimony jury instruction under R.C. 2923.03(D) amounted to plain error, we conclude that, because Dayton's trial counsel's failure to request the R.C. 2923.03(D) instruction or object to its omission did not prejudice the outcome of Dayton's trial such that Dayton received ineffective assistance of counsel, the omission of the instruction does not satisfy the prejudice requirement of the plain error standard. "The prejudice required for ineffective assistance of counsel is somewhat less than that required for plain error." *State v. Richmond*, 2d Dist. Greene No. 2005-CA-105, 2006-Ohio-4518, ¶ 163. "The plain error test is higher and more difficult for a defendant to establish. While a finding of no prejudice in an ineffective assistance of counsel claim would necessarily preclude a finding of plain error based upon counsel's alleged ineffectiveness, the same does not apply inversely." *State v. Huff*, 5th Dist. Stark No. 2006CA00081, 2007-Ohio-3360, ¶ 73 (Hoffman, P.J., concurring). Dayton failed to show that there is a reasonable probability that, but for his trial counsel's failure to object to the omission of the R.C. 2923.03(D) instruction or to request that the instruction be given, the result of his trial would have been different. Thus, we necessarily conclude that Dayton has not shown that the result of his trial would *clearly* have been different had the jury

received the R.C. 2923.03(D) instruction. As such, Dayton has not demonstrated plain error.

{¶125} Dayton's second and third assignments of error are, therefore, overruled.

{¶126} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**